Good morning. It may please the Court, my name is John Bloomquist. I'm an attorney from Helena, Montana. Here on behalf of the state of Montana, I would like to, on my primary argument, to go for about 20 minutes and try to reserve 5 for response. Okay, thank you. It's important to remember in this case that we're talking about the Daniel Ball test. The Daniel Ball test is a rule to allocate riverbed title. The test is the standard by which public rivers are determined in the law. And, of course, those rivers under the test are public rivers when they are used or susceptible to use as highways of commerce in the customary mode of trade and travel on water. Now, that's important to remember, is that what we're doing here in this case is determining or allocating riverbed title. So the test that's being applied here is a federal question, it's a federal test, and the elements of it have been frequently stated by the United States Supreme Court. Where that test applies... Counsel, if I may interrupt, what is your position on the standard of review and how does FRCP 52 affect your argument? Thank you, Your Honor. The questions that Montana raises in this case are legal questions. The application of the Daniel Ball test, the application of the components of the test, those are legal questions. As this Court has reviewed in Riverfront Protection, for instance, an over-review. The state is...the errors the state assigns in this case are in the district court's failure to apply the actual use test, the prong one of the Daniel Ball test. The state also alleges error in the application of prong two, the susceptibility to use test. The state further alleges error in the application of the required segment-by-segment test. These are all legal questions that this Court should review de novo. We are not asking the Court to review or get engaged in factual questions, questions such as the relevant segments that the Court determined and modified in the course order. I guess that's what I'm a little bit confused about. Some of the arguments that I understood you all raising because I just want to be clear. The district court found that the Big Belt Mountain segment of the Missouri River was not actually used in commerce in 1889. That's a fact, correct? The underlying evidence are factual questions that are presented to the Court. However, the application of whether there was actual use... So wait, are you saying that the district court made a legal error or a factual error? I need to be clear on that. The district court made a legal error in the evidence that was presented and interpreting the evidence that was presented on the question of actual use. The standards of actual use have been explained in many cases, and the evidence that was presented met those standards. So our assertion is that the district court erred in applying the test, the actual use test, by ignoring what was presented to the Court in terms of actual navigation. It sounds like you're challenging the facts, though. I mean, I can see the factual conclusion that the district court made. Well, I think it arises, Your Honor, in what we're determining here is a legal question. Are these rivers navigable under the Daniel Ball test? That is a legal determination. What's the evidence of actual navigation that the district court ignored? Thank you, Your Honor. On the Big Belt Mountain segment for the Hauser and Holter Reach, the evidence began, of course, with Lewis and Clark navigating up the river. However, as you get closer to statehood, in 1872, Thomas Roberts navigated from Three Forks, Montana, to Great Falls, Montana, in a skiff with gear and an assistant to survey the river. In 1879, Captain McGuire navigated from Stubbs Ferry down to Great Falls with a crew of 15 to 17 in a Mackinac, a 50-foot Mackinac. In 1880, the Army Corps surveyed the river. In 1890, the Army Corps again surveyed the river in two quarterboats, 14-foot wide, with a crew of approximately 28 people. Did the district court ignore those facts? Did they disregard them? Did they consider them and found other evidence to be more? I guess that's why I just want to understand that. And I think that's a very important point here. The district court acknowledged at least some of these activities, and the other one I don't want to forget is the Rose of Helena, a steamboat, that went from Townsend to the Gates of the Mountains, which is all the way through the Hauser Disputed Reach, and later navigated down to Great Falls and back, and then for years navigated within the Big Belt segment. The district court acknowledged some of those activities, but discounted those on a couple reasons. One, in terms of the Roberts expedition, the district court discounted that evidence by quibbling with Roberts' conclusion that the upper Missouri was navigable by light-drafting steamboats. That doesn't apply that evidence of actual use. He's just quibbling with Roberts' conclusion. The error there is not by recognizing Roberts' demonstrated actual use through the entirety of the Big Belt Mountains segment. And that, you're arguing, is something like a legal error that we need to review de novo versus an error in the weighing of the facts? Yes, and the reason I say that is because the courts have recognized these types of uses qualify as evidence of actual use, qualify to characterize the river as navigable for tidal. That's the type of use the courts have specifically applied. We raised the same question on the Clark Fork with evidence of indigenous use. But it sounds like they just credited other evidence. I guess it sounds like the district court just credited other evidence, not this particular evidence. I don't know that the district court credited other evidence because the district court doesn't tell us. Quibbling with Roberts' conclusion does not tell us that there's other evidence. Ignoring the evidence of McGuire's navigation or the types of boats that were engaged in the navigation and what they did. I mean, these weren't simple canoes going down the river and some sort of pleasure exercise. This was actual engagement in surveying and commerce through the entirety of the Big Belt Mountains segment. Counsel, let me ask this. Is it your position that any evidence of any use of a given river is dispositive on the issue of whether a river could be navigated at statehood? No. Any use is not sufficient necessarily to establish navigability. That use must be of the type that is sufficient for purposes of demonstrating the river is used for trade or commerce, and that could be travel. That could be transportation of supplies. That could be transportation of gear. The mere walking up of the river by trappers or settlers, dragging their boats up the river, watering their horses, watering themselves, does not qualify as evidence of actual use. So it's not any type of use. And so the argument, at least my understanding reviewing all the documentation that was provided to the Court, my understanding was that what we were looking at for Montana was the smaller kinds of boats. Is that — am I correct? Yes. And that gets to another area that we allege the district court engaged in, which is the application of the second test, the susceptibility-to-use test. And the crux of that test is what were the customary modes of trade and travel at statehood? And in this particular instance, the district court recognized and correctly recognized smaller watercraft were customary modes at the time of statehood. And the district court recognized Montana's evidence and testimony that smaller boats, such as canoes, bateaus, perreaux, bateaus in particular, and mackinaws, were customary modes. At that point in time, under the navigability for title test, the Daniel Ball test, it was incumbent upon the district court to apply smaller watercraft to the question of, could those craft, customary modes, navigate the conditions of the rivers that were described at statehood? We're not quibbling with the district court's description of the conditions of the rivers at statehood. There were rapids. There were shallow water. What we're quibbling with is the test, the standard that should have been applied on susceptibility was related to smaller watercraft. That the district court did not do. And the only evidence before the court — But the court did consider the smaller watercraft. I mean, the district court explicitly said that it would be inappropriate to exclude those smaller watercraft. So I guess back to the question that Judge Mendoza asked earlier, is the problem here, in your view, how the district court weighed the evidence, or is it illegal? I think it's a legal question. I'll explain why. The district court did acknowledge those smaller watercraft. Importantly, the district court acknowledged the capabilities of those watercraft. Light draft, two to eight inches of water. Could navigate Class II, III, and IV rapids. That's what the district court found is the capability of those smaller watercraft. The district court then pivoted and stated in finding of fact number 19 that the court does not agree that an expert such as Jason K. June, Montana's expert witness, or somebody of comparable skills could navigate those craft. And that doesn't establish navigability because the court construed our evidence as suggesting Mr. K. June as an expert. Our evidence went to the craft itself. And I think as we briefed, at that point in time the district court committed error by inserting into the susceptibility test an element of the skill of the operator. Can I draw your attention to something else? Yes. Can I draw your attention to the log drives in the Clark River? Okay. As I understand, two of our cases from the 1980s, Oregon and Puget Sound, suggest that log drives can support navigability. But they need to be joined with other facts to really support that. I guess those cases suggest that the quality of the log drives actually matters. Do you have any evidence as part of the record as how those log drives turned out, other than that they just happened? In other words, what other evidence in the record suggests that, not that they just occurred, but something more substantive? Your Honor, the evidence on the Clark Fork, as even our own expert historian recognizes, is fairly scattered. We have newspaper accounts and some of those types of things. Sure. What we did have evidence of on the ground was the Eddy sawmill within the Eddy segment. We had evidence that that sawmill situated along the banks of the Clark Fork River within the Eddy segment had at least some newspaper accounts of log drives to the Eddy sawmill. Now, the district court dismissed that evidence. Right. So they occurred that there were some log drives, but the quality of them we don't know, correct? That's correct. I would agree with that. We just don't know. I could not, other than that they were reported to be 2 million board feet to the Eddy sawmill, I do not know the quality of those. All right. Thank you. I want to go back to a point you were making a moment ago, that it was a mistake for the district court to insert into the analysis the skill of the operator. If you could just explain why you think that's the case, because I guess it seems to me that if you had craft, you know, at the time of statehood, but no one could operate them, that that, I mean, that seems like it would be relevant. Well, the district court did two things with the skill of the operator. One, it seemed to reject Montana's evidence because it was presented by an expert on how these boats would operate or the ability to operate the craft coming from an expert who could do so. The district court then, and I think where the district court articulated this error, was in finding 127, where the court stated that it's not sufficient to ---- it disputed that the average statehood-era Montanan could navigate these craft in class 3, 4, and 5 waters. That's inserting into the test the standard of the average everyday Montanan being able to operate the craft. No court has ever inserted that element into the question of susceptibility or customary modes. To the extent a court has ever discussed or addressed the question of the skill of the operator was in the master's report in the Utah case, which we referenced. And there, the court and the master recognized experienced boat persons operating these craft, the so-called, quote, river rats, who lived on the rivers. And so to the extent skill of operator have ever, ever been addressed in Utah, it was certainly discussing experts where the court did not dismiss the evidence. The court accepted the evidence of customary craft. And so the skill of the operator test, and this is an important point in this circuit, because this circuit has many rivers which are public rivers. And this question arises in this circuit. And so to insert into the customary mode test an element that has never been articulated and, quite frankly, is wholly subjective, we believe is error in application of the susceptibility test. And if I might add, that error infects the district court's determination of non-navigability on each of the disputed reaches that we appeal. So susceptibility, and the test is either or, actual use or susceptibility. If Montana demonstrates either, it is entitled to a title under the equal footing doctrine and the navigability for title test. One point that I think is very important is where the test applies. The parties here have briefed two divergent positions for the court on where the test applies. And I think the PPL court was very specific on where the segment-by-segment test applies. It applies to determine whether the disputed rivers and the disputed reaches are navigable or not. That is an important issue to understand in terms of our argument that district court misapplied the segment-by-segment test. It applies to whether disputed reaches are navigable, not whether the entire relevant segments are navigable. Counsel, am I correct that the disputed reaches are defined by the FERC boundaries? That's correct, Your Honor. And weren't those FERC boundaries made long after Montana's statehood? Those FERC boundaries are, yes. The projects came along later, so the boundaries between River Mile X and River Mile Y were determined after statehood. That's correct. Okay. And they're not based on any physical qualities of the rivers, correct? No. They are points in the rivers that the State has claimed riverbed ownership. The disputed rivers are related to those boundaries, yes. So then how does that fit within PPL's requirement for physical-based segments? PPL discussed segmentation and said one of the reasons for segmentation is you need to determine, as I mentioned, the court expressly said to determine title, riverbed title, under the equal footing doctrine. So it's connecting riverbed title to the doctrine. The court considers the river on a segment-by-segment basis to assess whether the segment of the river under which the riverbed in dispute lies is navigable or not. The court then went on to say practical considerations also support segmentation, physical features which affect navigability. Topographic or geographic attributes also assist. However, those considerations are important in determining the physical setting that the disputed reaches are situated in. And this is important when you go to the consideration of susceptibility. When you're trying to describe and define the conditions of the river at statehood, those physical features, those characteristics of the river, the flow, all those factor into what was the natural and ordinary condition of the river at statehood. As the district court properly recognized, in the end, the ultimate inquiry comes down to navigability, not a determination of physical attributes, geographic attributes. In the end, the inquiry comes down to are the disputed riverbeds navigable or not. Well, Counselor, you said to look at the finding, 127 finding that the district court made, and I have, there the district court just assigned minimal weight to the opinion that was provided because of the concession that the expert made about even someone as experienced as the individual mentioned would have a hard time navigating that river. So I guess my point is where I started, which is it appears that the court considered those things, assigned a weight to it, and then said, I'm going to assign X amount of weight, and I'm going to consider and provide other things with greater weight. It appears, at least from the findings, my reading of it, that's maybe what they did. Well, in the question of susceptibility, it would be the first time that a court determined susceptibility based on the skill of an operator. The test has always been applied to the craft itself and whether the craft is capable of navigating the conditions of the river at statehood, the natural and ordinary conditions. That evidence, which I just discussed, was presented by Montana and was uncontroverted. The defendants had no expert testimony, no evidence that the smaller watercraft could not navigate the conditions described at statehood. The entire evidence from the defendants was based upon the Upland Steamboat being the customary craft and only that craft. And all their evidence was applied when you take the Upland Steamboat for susceptibility on a criteria of at least 40 to 60 inches of water depth and no more gradient than 4 to 5 feet per second. That was every one of their experts' opinion on all of these segments, is if it didn't meet those, if the river didn't meet those standards, then the Upland Steamboat could not navigate on it. They did not consider, and there's no evidence in the record from the other side that smaller watercraft were considered for purposes of susceptibility. So it would be the first time, Your Honor, that a court inserted into susceptibility and inserted into customary modes a standard of whether the average everyday Montana could operate the boat or you cannot present evidence that an expert could operate the boat. Those are entirely subjective. Do either of you have any other questions right now? Okay. Thank you very much. I know we have cross appeals. We'll make sure to get you back up for enough time. I appreciate it. Certainly more than three minutes. Thank you. Thank you very much. Mr. Stirrup? I hope I'm getting that right. Good morning. May it please the Court, Rob Stirrup, Brown Law Firm for Talon, Montana, formerly PPL Montana. The interests of Talon and Northwestern Energy are aligned. So Northwestern Council has ceded his time to me. I am one of the relatively few who has been involved in this case since its inception in 2003, 21 years ago. That long and winding road or perhaps torturous mountain stream includes a trial in state court, appeal to the state court, appeal to the U.S. Supreme Court, which primarily was handled by my colleague Kyle Gray and Dave Kennard, and then a retrial in federal district court. As the panel has heard, that retrial took 10 days, 15 experts, some 1,400 exhibits, and it resulted in a district court order that is 78 pages long. We submit respectfully that time has come for this case to come to an end. Montana's argument on appeal distills to this. Our experts are better than your experts. Our facts are better than your facts. The district court got it wrong on the facts. For example, Montana claims the district court failed to consider evidence of indigenous use. That's not true. That evidence was submitted. The court considered it. It found it insufficient. Montana contends that the district court failed to consider smaller watercraft. That's not true. All of Montana's evidence was admitted. None of it was excluded. The district court considered it and found it insufficient. Montana contends the district court failed to consider whether a disputed reach was navigable, even if the entire segment was not. That's not true either. Montana never asked the district court to do that, nor could it under PPL. The district court did consider whether an entire segment would be navigable for title, even though there were barriers within the segment. That's what PPL commands. That's what the district court did. The district court simply found the evidence insufficient. These are factual issues. They are subject to the Rule 52a standard, the clear error standard. I want to let you get on, but since we're on cross appeal, did you want to have any time for rebuttal or you want to make all your argument now? I will do all of my argument now.  Thank you. Okay. Go ahead. The clearly erroneous standard is a plausibility standard, as this court held in Chaudhry. If the district court's account of the evidence is plausible in light of the record, we may not reverse it. This case has been characterized as a battle of experts. This Court has held that reversal is almost impossible, where the Court credits some experts over others. In Alcoa, the Fourth Circuit addressed the title navigability issue. Some of the same experts in our case testified in Alcoa, Drs. Newell and Harvey. The Fourth Circuit correctly applied the clearly erroneous standard. Montana points out there is a discussion of de novo review in Alcoa, but that's for a subsidiary issue under North Carolina law that was decided on summary judgment, not title navigability. At most, we have here a mixed question of law and fact. In Boone, a title navigability case this Court held, those are subject to the clear error standard of review. In Lake Ridge, the 2018 decision, the U.S. Supreme Court held that in mixed questions, if factual issues predominate, then the clear error standard applies. Montana's relied on Puget. However, that was a regulatory case, not a title navigability case, and the Court applied the substantial evidence standard. That's the same as clear error. Montana relies on Aetna. However, Aetna, the facts were not in dispute. It was decided on summary judgment, which, of course, is a different standard. And finally, Montana relies on Riverfront Protective. In Riverfront Protective, this Court made clear that the facts were not in dispute. In fact, the opinion says that twice. In that case, the parties stipulated that log drives had been conducted on the river in question over an uninterrupted 17-year period with millions of board feet. The issue was whether enhancements to the river to facilitate the log drives were improvements to the river such that the river was not in its natural and ordinary condition. That was the issue that the Court resolved as a legal matter. We don't have anything like that in this case. In this case, Dr. David Emmons, a historian, testified that he had scoured the records of the University of Montana, of Western Montana logging companies. There's no evidence of log drives on the Clark Fork. The logs went east to Butte and Anaconda for the mines. Dr. Littlefield for the state testified there had been log drives, but he admitted that those ended at Nine Mile Creek. That's outside the relevant segment. There was evidence of a 1905 log drive that was one and done at a time of high water after the river had been approved by the Thompson Falls Dam. There was another log drive that ended in disaster. The logs went over the falls, as did the log rafts, and one man lost his life. Montana fared no better on the Missouri. The records of the Meyer Log Company, the Holter and Lumber Company, established that those log drives began and ended outside the relevant segments. One of Montana's historians testified that there were press accounts of log drives, but as the evidence established and our experts established, those were aspirational frontier press boosterism. The frontier press was notorious for reporting things that hadn't happened but that they hoped would happen. And the district court did consider the use of bateau and rafts in connection with log drives. For example, Montana put in evidence of bateau shepherding the logs, but that was near the Idaho border while outside the relevant segments. In sum, there simply was not credible evidence of log drives in any of the relevant segments. Could you spend a moment now talking about this issue of the skill of the navigator and, you know, why it would not be an error, assuming this is your view, or why it was not an error for the court to consider whether the average Montanan could use craft? Thank you.  In PPL, the court articulated a standard that has existed from the time of Daniel Ball, and I will characterize that as a commercial reality standard. As the court stated in PPL, the river in question must have been able to sustain the kinds of commercial use that as a realistic matter might have occurred at time of statehood. The court in PPL used that phrase again in connection with seasonality, saying the river must be susceptible to navigation for a long enough period during the year that is commercially realistic. That dates to the Daniel Ball test itself, highway of commerce. Commerce is the key, and as elsewhere pointed out in PPL, the test concerns the river's usefulness for trade and travel rather than other purposes. Expert boatsman Cajun, a daredevil whitewater enthusiast using modern watercraft, is not transporting valuable goods in commerce as frontier Montanans were in 1889. Frontier Montanans in 1889, who needed to transport their goods in commerce, had to address commercial realities. Was it reasonable? Was it commercially realistic to use that? And the evidence that a man like Cajun can do it in modern watercraft simply does not address that test. I take their argument to be that here the district court committed a legal error in assigning or looking at the skill level of the individual, and they point to that particular finding that the district court made. I believe it was finding 127. Can you just specifically address that? Yeah, and what I think the panel must understand is Mr. Cajun testified that he could traverse any river in Montana, even Class V rapids. So if that were the test, then any river segment anywhere would be navigable for title. The test demands something more. The test demands that the Court look to what was susceptible as a matter of commercial reality in 1889. The boats that Cajun were using were not similar to the watercraft in question. The district court correctly so found, based on the factual record, and that is not challenged. And an example illustrates the point. On the Yeti segment of the Clark Fork River, there are three major impediments to navigation. We've got the Yeti Islands, a narrow, twisting two-mile stretch that is shallow. We've got the Plains Rapids, a section of three rapids that are very narrow, very fast river. The gradient is up to 22 feet per mile in that section. And then we've got the mid-channel bars and riffles, also narrow, also twisting. Montanans at time of statehood had a crying need to transport their goods in commerce. The commercial demand was high. Montanans wanted to use the rivers to transport their goods in commerce. Transport on the waters was exponentially more economical than on the roads. Dr. Attack testified, up to 90 times more expensive to transport on the roads. Montanans at time of statehood did not put their boats, their smaller watercraft, in the Clark Fork River in the Yeti segment to get to the markets. They used a road. The road paralleled the river, and that was strongest evidence, and a question, frankly, Montana has never been able to answer. If this river were susceptible to navigation in 1889, if Mr. Cajun was correct that anybody could reasonably transport their goods on the Yeti segment, why didn't frontier Montanans do it? Occam's razor, the simplest answer, is the best answer. They didn't because the river was not susceptible. And to credit the testimony of a modern daredevil whitewater enthusiast over that historical record, we think would have been certainly an error, but fundamentally it's a factual issue. Montana says the court applied the facts to the law. Well, the courts do that in every case. That doesn't mean it's a legal issue. The factual issues predominate. And I have to talk for a moment about this disputed reach issue that counsel raised. My notes indicate that my first job is to make sure this panel understands, as the district court understood, the difference between a disputed reach and a segment. The disputed reach is a FERC project boundary. That's the footprint. It's the spillway. It's the reservoir. Created by FERC as a matter of administrative convenience after the dams were constructed decades after statehood. Conversely, the segments are a function of the physical properties of the river at time of statehood. And as those physical conditions of the river bear on navigability. When Montana says, as they did in their briefing, we only want a title to the disputed reaches, what they're really saying is we only wanted damages for the disputed reaches. The only part the disputed reaches play in this case is damages, if we ever get to that phase of this case. Under Montana's damages methodology, the shared net benefits methodology, there is a comparison of riverbed acreages owned by Montana and not owned by Montana in the FERC project boundary. That's the only part that it plays. Title navigability turns on river segments, not the FERC project boundaries. And in this case, we had four world-class fluvial geomorphologists. Montana's experts submitted their reports first. Dr. Schmidt and Wilcox provided the beginning and end points of the river segments. Our experts, Drs. Messiter and Harvey, agreed with them, with only minor exceptions that are not implicated on appeal. Montana invited the district court to make an entire segment determination, not a disputed reach determination. And nor could Montana do that. And proof positive is found in the Sun River to Black Eagle segment. That's the one segment that the court found in favor of Montana. When it did that, the court granted title to the entire Sun River to Black Eagle segment to Montana. It's at pages 77 and 78 of the decision. It did not grant title to Montana of only the disputed reach, and that's because the district court recognized that the disputed reach had nothing to do with title navigability. Now, Montana could and did argue, listen, even though there are some barriers within a given segment, we think the segment itself is still navigable. The PPL decision acknowledges that that's a possibility. In PPL, the Supreme Court said that these disruptions, these rapids, these riffles, might be so minor that the segment nonetheless is navigable. Montana made that argument to Judge Christensen. Judge Christensen rejected it on the facts. On the Big Belt Mountain segment, for example, while there's a six- or seven-mile reach that was piloted by steamboats on pleasure trips, picnic trips, not a commercial venture, and this was after the river had been improved, by the way, but that was a six- or seven-mile segment within the larger 45-mile Big Belt Mountain segment. Well, also included in that segment are the Fearsome Beartooth Rapids, the White Rock Rapids, the Reef of Rocks, and the Rock Rapids. As the district court correctly found, these are not minor interruptions. They make the entire segment non-navigable. And Montana's argument today for the disputed reaches is an attempt to minimize or ignore those disruptions. That was the error of the Montana courts in 2010 when they adopted a whole rivers approach that allowed them to ignore or minimize the 17-mile Great Falls reach. If you're looking at the entire 200-plus-mile Upper Missouri, then a 17-mile reach maybe isn't a big deal. You can ignore it. The U.S. Supreme Court said that was the primary flaw in the reasoning of the Montana courts. Well, Montana's doing the same thing now. They're asking the court to ignore or minimize significant barriers to navigation. The district court correctly interpreted the test, correctly applied the test. Montana is, to borrow a phrase from Abel Counsel for Montana, quibbling with the district court's factual findings. Clear error is the standard. And while I'm on the 17-mile Great Falls reach, the Supreme Court did determine as a matter of law that that reach is not navigable for title. We brought that to the attention of the district court. The district court granted our motion to dismiss for three of the five dams in the 17-mile Great Falls reach. The court, however, truncated that 17-mile reach into an eight-mile reach so it encompassed only three of the five dams. In so doing, the court seized upon two words in the opinion, at least, at least from the head of the first falls to the foot of the last. We submit those two words cannot bear the weight assigned to it. What the Supreme Court meant was the Great Falls reach is 17 miles at least. It might be longer, but it's at least 17 miles. We believe that was a contravention of the mandate rule and that that order should be dismissed as a legal matter, not a factual matter, under the mandate rule. Okay, thank you. Do either of you have any questions? Thank you very much. Okay. Mr. Anderson. Good morning, Your Honors, and may it please the Court. Christopher Anderson from the United States. I'd like to begin, if I can, by backing us out a little bit and going back to what the basic question was that was before the district court. And that, as we've all heard, is the Daniel Ball test. But I particularly like the Supreme Court's restatement of that test in the Montello, in which the Court said that to give a river the character of a navigable stream, it must be generally and commonly useful to some purpose of trade and agriculture. And so the question, the factual question that was before the district court, is whether the rivers in question were actually used or were capable of being used at the time of statehood for some generally and commonly useful purpose of trade or travel. That is the ultimate factual question. Now, that's a complex factual question that required the district court to look at a lot of different things, had to look at the characteristics of the rivers, it had to look at the characteristics of the watercraft that were available at the time, it had to look at the characteristics of commerce that were prevalent in Montana in 1889, in and around 1889. But the ultimate factual question, the ultimate factual question that this Court should review for clear error is whether those segments were capable, as a practical matter, of being used as highways for commerce. In the United States' view, is there anything that Montana has argued in its briefs or here today that is really a legal issue that we should be reviewing de novo, or is your view that... No, it's our view, Your Honor, and I apologize for cutting you off, that these are all factual questions. And so, but it's important, I think, to focus on the arguments that Montana makes are about different facts than the ultimate factual questions. When Montana argues, well, you could have piloted this type of boat down this segment, that may or may not be true. But that's not the factual finding, the ultimate factual finding that the district court made. The ultimate factual finding that the district court made was you could not pilot those smaller watercraft down these segments in a way that was useful for trade or agriculture, that was useful as a practical matter for commerce. And we would submit that that is a factual finding that's reviewed for clear error. But even if the court were to decide that, no, it's actually, it's a mixed question and I point out, I couldn't help but notice that counsel for Montana kept talking about the application of the test and the court's reviewing the application of the test to the facts of this case. That sounds a little bit like a mixed question. But even if the court were to review it as a mixed question, the Supreme Court has said when factual issues predominate, an appellate court should be very deferential to district court's findings on that mixed question. And this is a case in which the factual issues heavily predominate. There are questions of geomorphology, there are questions of historical commerce and historical craft usage. These are things that don't, questions, the answers to which are not derived from legal standards, they're derived from evidence and expert testimony. So for that reason, we think the appropriate standard review is for clear error and that Montana's various arguments that maybe the district court didn't think fairly assess the evidence in some specific point are, A, review for clear error, but even if the court were to disagree with some specific issue, don't call into question the larger factual, the ultimate factual conclusion that these segments were not susceptible to use, practically speaking, for commerce. The other thing I want to talk about is this question of segmentation. And in particular, I want to address our position that Montana has waived this argument. So this case, as my colleagues have recounted, has been litigated extensively. And in the district court, in the pretrial filings and at trial, the whole case was litigated on the premise that the question before the district court was whether these reverse segments were navigable, not whether the disputed reaches were navigable. Montana contests that. It cites its complaint. It cites portions of its proposed findings of fact and conclusions of law in which it describes the disputed reaches. But those same proposed findings in fact and conclusions of law said things like the question to be answered is whether the segments containing the disputed reaches of the river at issue are navigable. That's at further excerpts of Record 27. That's Montana's proposed findings of fact and conclusions of law. Montana said that the question is whether the segments as defined by the physical features characteristic of those segments are navigable. That's at further excerpts of Record 150. And then at further excerpts of Record 157, Montana said Montana claims that the navigability in fact of particular reverse segments in order to establish its title to particular riverbed reaches contained in those segments. So we submit that it was very clear that all parties understood that the question before the court was whether the relevant segments were navigable in fact. And in fact, if that weren't the question, why were the parties litigating the boundaries of the relevant segments? What purpose did that have? So our view is the Court doesn't need to weigh in to what is, the United States thinks, a complicated question of the correct test for defining segments. We think that that question has been entirely at least forfeited, if not waived, and that the Court should decide the case on the basis of the relevant segments as the district court did. But if the Court were to reach the question of the proper segmentation, we agree fully with Montana that PPL requires the Court to look at physical aspects of the  And that makes sense because navigability at the end of the day is a question of the physical aspects of the river. And the last thing I'll say on this point, Your Honors, is even if Montana hadn't litigate, purposely litigated this case on the basis of the relevant segments, Montana even now has not pointed anywhere where it argued to the district court that the disputed reaches are appropriate units for assessing navigability, where it introduced evidence that they're appropriately, that those would be appropriate boundaries for assessing navigability, or where it even introduced evidence that those disputed reaches themselves are navigable. You know, Montana says, well, it's error because the district court looked at obstructions outside of the disputed reaches. But that, let's assume that's right. That doesn't establish that the disputed reaches themselves were navigable. And so, again, it just underscores the fact that this case has been litigated on different premises, and it's too late in the day now to go back and reexamine those. The last point I wanted to make, Your Honors, is that title navigability is different. The Daniel Ball test applies in a variety of contexts, but title navigability is probably the most restrictive context and the context in which it is hardest to establish navigability, and that's because title navigability looks at a very specific time and space. It requires that the river have been navigable or susceptible to navigability at the time of statehood and in the context of the commerce that was taking place in that State at that time. And that way, it's very different from assessing navigability for regulatory purposes, commerce clause purposes, et cetera. If the Court has no further questions. Do either of you have questions? Okay. We would ask that the Court be affirmed. Thank you very much. Okay. Mr. Blomquist, we'll give you five minutes for rebuttal. Thank you. Thank you, Your Honor. I want to start with the argument of the United States as far as susceptibility and linkage, if you will, of the smaller watercraft to commerce. The District Court expressly did that in finding the Facts 16 and 17 where the Court found that the customary modes, these smaller watercraft, were in fact used for transportation and commerce at or near the time of statehood. So this argument that these craft must be used in commerce, the District Court already found they did. I want to make sure for Justice Mendoza, when I was referring to the everyday Montanan, if you will, or that element, I was referring to Paragraph 127. I hope you understood that rather than Paragraph 27. That's where I see that. The question of segmentation and whether Montana's position was that the question of navigability is applied to disputed reaches has been Montana's position since the start of this case. That has never changed, never wavered. We pled the disputed reaches. Because this was a federal quiet title act, once the case, once the United States was inserted into the case, we had to plead with particularity the lands that we claimed to own. Those have always been the disputed reaches on the hydroelectric projects. And that, as PPL articulates, the test for navigability is whether those disputed reaches are navigable. That is the exact test that Utah described as well as Brewer-Elliott. So it's never been our position any different that that's where the navigability test should apply. The Court recognized this in finding of fact number four. The District Court specifically understood the difference between the relevant segments, the geomorphic channel segments, the physical segments, versus the disputed reaches. And the Court recognized that the test for navigability was not governed by the physical and geomorphic segments. It was governed by the question, the specific question of whether those disputed reaches were navigable or not. And that is where we allege the error of the District Court in applying the segment by segment test is by not applying it to the disputed reaches, which is another directive under Utah and PPL. Segmentation not only applies to the disputed reaches as whether they are navigable or not, but it is incumbent upon the Court to determine precisely where navigability begins and ends. And the reason for that is we're talking, again, about riverbed title, allocating riverbed title. And this is best illustrated in the Big Belt Mountain segment, where the rapids that defendants allege were barriers to navigation and the District Court found were barriers to navigation are nowhere in the Hauser disputed reach. They are wholly downstream. In terms of precision that the PPL directs and Utah directs the Court engage in, on the Eddy segment on the Clark Fork River, the disputed reach, the barriers the Court found to lead to non-navigability of the Eddy segment and the Thompson Falls disputed reach are situated upstream, outside of the boundary of the disputed reach. The only one that arguably would exist within the reach is the Eddy Islands. And in those circumstances, assuming the Eddy Islands was, in fact, a barrier, which, again, we say it was not for smaller craft, and the evidence showed that smaller craft could navigate easily through the Eddy Island segment or Eddy Island portion. Under... But we can't just look at smaller craft, counsel. Pardon me? We can't just look at smaller craft. Smaller craft are the customary mode. Smaller craft, as found by the District Court, these smaller watercraft were customary modes of trade and travel. I agree with you that that's what the District Court said, and I agree with you that that was the practice. But to limit it to only smaller craft, I think, is a mistake. Well, and I would disagree there, Your Honor, because the courts have said customary modes of... Navigability is not dependent upon the mode, if you will, of what the customary mode is. It's not limited to large freight-bearing craft. It could be smaller craft which are capable of engaging in the simpler types of commerce. Commerce is not solely determined by the size of the craft, the size of the cargo. Customary modes and commerce and transportation, as the courts have reiterated repeatedly, can be with smaller craft. And so the directive is the determination of navigability cannot be limited to just those craft which would be cargo-carrying or large, you know, aspects of commerce. The courts recognize simpler commerce as qualifying for purposes of the navigability test. Do either of you have any other questions? Okay. You can take a moment to finish up. Thank you. All right. I just want to make a couple of comments on the cross-appeal so I don't just ignore that. Go ahead. Yeah, you can take a moment. The PPL court did not mandate the entire 17-mile Great Falls reach as non-navigable. The court, in the opinion, specifically recognized that the 17-mile Great Falls reach, and this is an important qualifier, at least from the head of the district, is non-navigable. And the court, the district court recognized that PPL opinion carved out a portion of what they were referring to as this Great Falls reach as not subject to the opinion or the holding of PPL, which Northwestern agrees the holding of PPL said that. So this idea that the holding and the mandate were for this entire 17-mile reach is not what the language of the opinion states. And it's important when considering the mandate that the district court look at the  And here the district court did look at the opinion in addition to the substantive law that underlies the opinion, which is what this court has indicated is worthy of mention. And in this instance, the district or, excuse me, the PPL court is expressly stating segment by segment is the way to determine riverbed title. And in addition, it is important to determine where navigability begins, where it ends, and with precision. The district court properly looked at the language of the PPL regarding the Great Falls reach and found ambiguities. And whether it's 10 miles, 17 miles, whatever it might be. So without the substantive law should also be reviewed in looking at what the opinion was, what the mandate of the Supreme Court was. And if the court does that, the court will see that the district court was correct in dismissing or, excuse me, denying the motion as to the river above the head of the first waterfall and below the foot of the last, which is exactly what it did. Thank you very much. Thank you. Mr. Blomquist, Mr. Stirrup, Mr. Anderson, we thank each of you for your very helpful arguments today. And we thank all counsel on this case for the very helpful briefing in this case. It was of great assistance to us. This matter is now submitted and our court is in recess until tomorrow morning. Thank you. All rise.
judges: THOMAS, MENDOZA, ALBA